1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  JEREMY D. STRAIN,                        No.  2:14-cv-1008 CKD P

12                 Petitioner,

13       v.                                  ORDER

14  PEOPLE OF THE STATE OF
    CALIFORNIA,
15
                   Respondent.
16

17       Petitioner, a former state prisoner, is proceeding pro se with a petition for writ of habeas

18  corpus pursuant to 28 U.S.C. § 2254.  He challenges his 2009 conviction for aggravated mayhem

19  and aggravated assault.  (ECF No. 1 ("Ptn.") at 1.)  Respondent has filed an answer (ECF No. 20),

20  and petitioner has filed a traverse (ECF No. 22).  Both parties have consented to magistrate judge

21  jurisdiction to conduct all proceedings in this case.  (ECF Nos. 8 & 17.)

22       Upon careful consideration of the record and the applicable law, the undersigned will

23  deny the petition for the reasons set forth below.

24                            BACKGROUND

25  I.  Facts

26       In its affirmation of the judgment on appeal, the California Court of Appeal, Third

27  Appellate District, set forth the factual background as follows:

28            Defendants accosted several people at a public park, leaving a park

                                        1

worker paralyzed and another victim with a stab wound, concussion and broken jaw.

. . .

## The Charges

An amended information filed on April 8, 2009, charged all four defendants with the following:

Count one—Attempted murder of Richard Dickerson (§§ 664, 187),

Count two—Aggravated mayhem on Richard Dickerson (§ 205),

Count three—Assault by means of force likely to produce great bodily injury (GBI) on Richard Dickerson (§ 245, subd. (a)(1)),

Count four—Assault by means of force likely to produce GBI or with a deadly weapon, a knife, on Jeffrey Dobbs (§ 245, subd. (a)(1)), and

Count five—battery resulting in infliction of serious bodily injury on Jeffrey Dobbs (§ 243, subd. (d)).

As to counts one and three, it was alleged that defendants personally inflicted GBI causing paralysis and a coma to Richard Dickerson. (§ 12022.7, subd. (b).) As to counts four and five, it was alleged that defendants personally inflicted GBI to Jeffrey Dobbs. (§ 12022.7, subd. (a).) As to all counts, it was alleged that defendants committed the offenses for the benefit of, at the direction of and in association with the Norteño criminal street gang. (§ 186.22, subd. (b)(1).)

## Dual Juries

The parties agreed to dual juries. A separate jury was impaneled for Nelson, so that the jurors in his case would not hear evidence of a videotaped conversation between the other three defendants at the sheriff's station in Nelson's absence.

## Prosecution Case

On May 11, 2006, defendants got drunk and made trouble for various people at Hagan Park in Rancho Cordova. That evening, they attacked and seriously injured the victims, Richard Dickerson and Jeffrey Dobbs. The eyewitness testimony conflicted as to exactly who did what.

Dickerson, a park worker, was unable to provide details at trial because the attack left him with memory loss.

Dickerson's companions, his friend Jeffrey Dobbs and his cousin Daniel Riddle, had volunteered to help Dickerson set up a stage. As they were preparing to leave the park, they heard a woman, later identified as Betty Williams, calling for help, asking that someone

2

call 911. Williams and a male holding a 12–pack of beer—whom Dobbs and Riddle identified as Kent—yelled profanities at each other. According to Dobbs, Kent had approached behind Williams and was yelling at her in a threatening manner. Dobbs told a sheriff's deputy that the person he later identified as Kent called Williams a bitch and told her, "I'm a Norteño." Riddle testified that Kent said he was "East Side Piru" and she was "fucking with the wrong people." Dickerson and his companions approached the group to calm the situation.

A passerby who looked like a drug addict approached. All witnesses and the parties referred to this person as "Tweaker." FN2 Kent asked Tweaker, "what the fuck are you looking at" and faked as if he were going to throw a can of beer at Tweaker. Tweaker took out a knife and threatened to take Kent's life.

FN2. This person was never identified. We will refer to him as "Tweaker," as did the witnesses.

Kent made a noise "kinda" like a yell, and four to five males, mostly White, came running down the hill to his aid. There was a physical "tussle" between Kent and Tweaker. By that point, the group running down the hill was about 20 feet away. Dobbs and Dickerson were on their phones trying to get through to 911. Dobbs told the group that they were "on 911" and suggested that everybody go their separate ways. Dickerson said, "Hey, I work here. You guys got to go." Dobbs testified that Kent threw a beer can at Dickerson which struck Dickerson and knocked him to the ground.FN3 Tweaker was also hit with a thrown beer can, and ran away toward the parking lot. Dobbs said two of the males chased after Tweaker. Dobbs said three or four males kicked and stomped Dickerson's head and body as he lay on the ground with his knees pulled up in a defensive position. Dobbs initially identified Kent as one of the people who had kicked Dickerson. He said he last saw Kent when Tweaker ran, but was not sure whether Kent ran after Tweaker. Dobbs later testified Kent was in the group around Dickerson when Dickerson was being kicked, but he could not be sure Kent did any stomping or kicking. Riddle, who was already backing away, and Williams ran to Dickerson's nearby truck. Riddle said the males in Kent's group surrounded Dickerson and Dobbs. Riddle identified Kent as one of the people who was kicking Dickerson.

FN3. Dobbs had previously told police that the subjects who attacked Dickerson knocked him to the ground.

Dobbs was attacked by three people. During this assault, he was punched in his jaw and ribs, stabbed in the side, and then hit on the back of the head as he fled toward Dickerson's truck.

Dobbs fell several times while he was attacked. After the fourth time he fell, all of his assailants stopped their assault on him and went toward Dickerson. When Dobbs got to Dickerson's truck, he looked back. He thought there were five to six people kicking and stomping Dickerson at that time.

3

Sometime during the mêlée and after Dickerson was hit with a can of beer, Dobbs heard a male voice refer to the Norteños gang. He also heard a male voice say, "[i]t's a Rancho thing" and "You fucked with the wrong people." He did not know who said those things.

At trial, Dobbs was unable to identify his attackers. He had told a sheriff's deputy and testified at the preliminary hearing that a shorter, Mexican guy flanked him and stabbed him in the side with a knife, but he was not sure at trial. Nelson is Puerto Rican, and the only Hispanic male in the group.

A truck from the adjacent parking lot, which may have been driven by Tweaker, drove toward the group and hit Holloran. Dobbs testified the truck drove "right into the crowd" that was kicking and stomping Dickerson, and the person that was hit was on the asphalt "[a]bout ten feet" from Dickerson. Dobbs testified that at the moment of the collision, the person who was hit was in the general area of Dickerson, but was not kicking or stomping him at that time. Dobbs testified he could not tell whether that person had kicked or stomped Dickerson. Defendants collected Holloran and fled.

Dickerson suffered major trauma, with injuries to his head, including fractured facial bones, and a single injury to his wrist, which could have been a defensive wound. He was in a coma for three months. He testified from a wheelchair and was still unable to walk. At the time of trial, he was living in a facility for people with traumatic brain injury.

Dobbs suffered a stab wound to his right lateral chest, a jaw fracture, and a concussion. He had surgery, during which his jaw was wired shut and a metal plate with screws was inserted into his jaw.

Betty Williams testified that shortly before the attack, she and her then-boyfriend, Norman Thompson, encountered a group of people in the park—two females who appeared Mexican, several males who appeared White, and one male who looked of "mixed" race and had "brownish-green" eyes, later identified as Nelson.

One male was called Joe (Holloran's first name) by the others. The mixed-race male asked for a cigarette in a "stronger than polite" voice, and Thompson gave him one. Then the mixed-race male asked Thompson where he was from. Thompson said, "San Francisco." Williams testified that the mixed-race male looked Thompson up and down, angrily hunched his shoulders up and forward and said he was from "Piru." After reviewing the statement she had made to sheriff's deputies, Williams testified that she thought it may have been the guy who had been called Joe who made these statements. In response to the statement about being from Piru, Thompson said, "Well, this is the Bay." Williams and Thompson ran away in different directions, with some of the group following Thompson, and others following Williams. She thought the men who chased Thompson were "Joe" and the mixed-race

male. As she fled, Williams screamed "somebody call the police." Williams testified the park worker tried to help but ended up on the ground with several men punching and kicking him. She saw the two males who had chased Thompson swing at another person who had tried to help her and then join the other three males in attacking the park worker who was on the ground.

Jeffrey Brown encountered defendants earlier that day. He was sitting in the park with friends Debi Ravareau and Angela Freitag and their children. A group of about eight males and two females, some White and some Hispanic, walked by, followed by two intoxicated White males drinking from a vodka bottle, "cussing" loudly and making vulgar comments. Brown asked the two to watch their language because "two ladies [were] sitting there." In response, one of the two put his fists up and the other punched Brown on the chin. FN4 Brown wisely disengaged and kept his distance but kept an eye on the troublemakers. Brown later saw them as part of a "swarm of guys" in the parking area, kicking and punching a person who was on the ground.

FN4. At trial, Brown was not sure, but he thought it was Holloran who punched him, and that the other person who was present at that time was Kent. He had previously identified a photograph of Strain as the person who punched him when shown a photo lineup by a sheriff's investigator. Ravareau testified that the person who punched Brown was Strain. According to Ravareau, after Brown was struck, Kent laughed and said, "we own you" and "you need to go sit down." Strain testified he was the one who struck Brown and thereafter told Brown to "go off with his bitches" as he and Kent walked away.

Ravareau saw a Hispanic male, Holloran, and another White male run toward the park worker (Dickerson). Each man, one after the other, hit Dickerson in the upper body. She could not tell whether they hit Dickerson in the chest, face or head. Dickerson dropped to the ground after the third man punched him.

The three men, including Holloran, then went to a person Ravareau learned later had been stabbed (Dobbs). She saw a "scuffle" with the three men moving their arms and hands. They appeared to assault Dobbs together. Although her recollection was hazy, she acknowledged having testified at the preliminary hearing that she saw one of the three hit the stabbing victim in the side. She turned and noticed Kent, Strain, and a third White male run toward Dickerson and kick and stomp him as he lay on the ground. She saw a vehicle strike Holloran.

Angela Freitag testified at the preliminary hearing that she thought the person who got hit by a vehicle (Holloran) was part of the group "stomping" on Dickerson.

After Holloran was hit by the vehicle, the other defendants loaded him into Kent's red Bronco and brought him to the nearby Holloran home. A neighbor heard something hit the ground as the Bronco went by, and picked it up. The object was a wallet. It contained

some of Dickerson's identification, but there was no money in it.

At the Holloran home, Nelson told Holloran's father, Timothy Holloran, "Dude ran over Joe." The father told a sheriff's deputy that Nelson said they stopped the driver, and took his driver's license from him, which Nelson handed to the father.

Holloran's married sister, Sarah Holloran Linggi, testified that Kent and Strain came to her apartment that night and said her brother had been hit by a truck. Kent was not wearing a shirt and he had dried blood smeared on his chest. Strain lived in an apartment that was directly upstairs from Linggi's apartment.

Nelson telephoned Linggi later and asked if her brother was okay. According to Linggi, Nelson said he loved her brother like family and he "would kill somebody" for him. Nelson said he hit somebody in the head with a bat at the park that day and stabbed someone. FN5  On direct examination, Linggi testified that Nelson did not say whether the person he stabbed and the person he hit with the bat were the same person; nor did he say why he stabbed and hit somebody with a bat.  She also said he did not say how many times he stabbed someone, but said he hit the person with the bat four or five times in the head.  She told him to "shut up" because she did not want him to get in trouble.  A few weeks later, Linggi reported Nelson's admissions to the sheriff's investigators because she wanted to get it off her chest and "[t]here were boys that were gonna go to prison for something they didn't do."  On cross-examination by counsel for Holloran, Linggi testified that Nelson said he stabbed the person because that person was on top of Holloran.

FN5.  None of the eyewitnesses mentioned a bat, although one was found behind the driver's seat in Kent's vehicle.

Strain's wife Kimberly (who married him after this incident) testified that Strain went out that day with Holloran and Kent in Kent's red and white Bronco. They came back to the apartment in the afternoon and picked up a friend, Jason "Bubba" Anderson. Strain, Kent, and Anderson returned as it was getting dark outside. They said Holloran got hit by a car. Kent had no shirt and was not wearing shoes when he arrived. Strain had "kind of a lot of blood" on his pants. Kent and Anderson said they "had that nigga choking on his own blood" and thought they killed him.  FN6

FN6. This evidence came in against Kent only. Anderson was not charged or called as a witness. Kent asserts he "impeached" Kimberly's testimony about what he said by eliciting that she did not disclose it until a few months before trial.

A helicopter appeared overhead and sheriff's deputies soon arrived at the apartment. Kent and Anderson went inside. Strain started to go inside, but then turned around and walked toward the deputies. After going inside, Anderson, who was staying at the apartment, supplied Kent with some clothes. They both cleaned up and changed clothes. Kent made phone calls in an attempt to get a ride

away from there. Strain's wife allowed the deputies to enter the apartment, where they arrested Kent and Anderson. Both were in her bedroom where the children were sleeping.

The deputy who entered testified that he announced "Sheriff's Department" three to five times. He found Kent and Anderson in the bedroom, pretending to be asleep.

Kent, who had been arrested and was seated in the patrol car, yelled repeatedly "[s]top snitching" to Anderson, who was talking to the sheriff's deputies. FN7 Kent's words were captured by a tape recorder in the patrol car. Among the things he said while in the car was "I didn't stick nobody." No deputies had said anything to him about anybody being stabbed.

FN7. The trial court instructed the jury that it could consider this evidence against Kent only and not against any other defendant.

A deputy sheriff took a statement from Holloran at the hospital. FN8 Holloran said he had pain in his back and "tailbone." Nevertheless, he was coherent and able to answer questions. Holloran said he went to Hagan Park alone, met some acquaintances, heard a commotion, which did not involve his acquaintances, was intentionally hit as he left the park by someone driving a truck, and got a ride home from someone he knew as "Dom." Holloran said he was "an associate of the Norteños" gang and told the deputy he had had a confrontation with "some Sureño gang members" two weeks earlier.

FN8. The trial court instructed the jury that this statement could be used against Holloran only.

At the sheriff's station, deputies placed Holloran, who had been released from the hospital, Kent and Strain in an interview room and secretly videotaped their conversation. The video recording was played for the Holloran/Kent/Strain jury but not for Nelson's jury.

At various points, the following was said:

Kent said, "Bubba [Anderson's] snitchin." Strain said, "Telling them everything," and Kent said, "Singing like a canary." Later, Kent said the people in the park snitched.

At another point, Holloran and Strain said they thought Nelson stabbed a person. Later, Strain said, "I think Robby [Nelson] stabbed him," and Holloran said, "Yeah, I'm pretty sure, but that's Rob for you." At another point, Strain said, "We had it taken care of. Why did he have to stab him?" Holloran said, "That's how Rob is. I mean, it would not surprise me at all."

At one point Strain reenacted stomping on somebody. At another point, Kent looked at Strain's shoes and said, "Your K–Swiss are so bloody." Strain replied, "If they were white, nigga, they'd be red" and "I put bodies on these."

Kent said he should have run when the police came to Strain's house. Holloran said his dad should never have called 911.

The three discussed jumping bail. Kent said he intended to call Aladdin and Strain responded, "That bail bondsman won't never see me again." Holloran also said Aladdin would never see him again. Holloran said he intended to flee to Canada and was never coming back. Kent said he would go to Minnesota and live with his uncle.

As we discuss post, Kent and Strain testified at trial and tried to explain away the conversation. We will also discuss Holloran's admission that he kicked the victim before he was struck by the vehicle.

## Defense Case

Holloran and Nelson did not testify at trial, but Kent and Strain did.

Kent testified he did nothing wrong. He only threw a beer at Tweaker in self-defense. He claimed that the witnesses who saw him kick or stomp Dickerson were inaccurate. He denied ever touching Dickerson. He claimed the only time he was close to Dickerson was when he picked up Holloran. Kent also denied throwing beers at Dickerson.

Kent testified that he, Holloran, Strain, Nelson, and Anderson drank alcohol that day. Kent was drunk, but his intoxication did not make him madder than he would have been if he had been sober; it made him less scared. Strain, who was "sloppy" drunk, punched Brown. Kent saw Strain in an angry verbal exchange with Thompson and Williams. Strain, Holloran, and Nelson chased after Thompson. Kent headed for the parking lot, where he came upon Williams pointing at him and yelling for help. Angry at being falsely accused, Kent yelled back. Tweaker approached in a threatening manner. Kent was scared. With a beer can in his hand, Kent hit Tweaker. Dobbs, who was 20 to 25 feet away from Kent, made a movement that Kent interpreted as pulling a knife. Tweaker ran away, and Kent ran after him. When asked at trial why he chased someone he supposedly feared, Kent said he did not know. When pressed, Kent said when Tweaker ran, "it kind of made [him] not scared." Kent claimed he did not hear Tweaker say, "I'll take your life." He also said he never saw a knife in Tweaker's hands. Kent saw Tweaker jump into a vehicle. Kent ran to his red Bronco. From his position in the parking lot, Kent saw Strain grappling with Dickerson. They were both on their feet and each had their arms around the other's upper body. Kent then saw Holloran step into the road, heard the engine "rev" in the truck in which he had last seen Tweaker, and then saw the truck drive directly toward Holloran and strike him. Holloran landed where the grass met the pavement, about six to eight feet from Dickerson who, by this time, lay unconscious on the grass. Kent helped Holloran to the Bronco. Nelson straddled Dickerson and went through his pockets. Nelson kicked Dickerson once in the head and then joined his friends in the Bronco. Kent agreed that the male described by witnesses as mixed race with hazel eyes was Nelson.

8

Kent testified that he had on red basketball shorts because he was given them by the school and red is one of the school's colors. Contrary to Williams's testimony, Kent denied ever saying he was an East Side Piru. He testified he yelled to Anderson not to talk to the police only because the police had nothing on them, and they did not do anything.

Regarding the recorded conversation at the sheriff's station, Kent testified he said Anderson was "singing like a canary" because, even though Kent himself was innocent, he "assumed" his friends were not. During the recorded conversation, Kent observed Strain's shoes were bloody. Kent testified that Strain said he "put bodies on these." Kent also testified that Holloran and Strain said they kicked somebody and that what they said was on the video recording of their conversation:

"[PROSECUTOR]: And they [Holloran and Strain] never told you they kicked anybody?

"[KENT]: Yes, they did.

"[PROSECUTOR]: Who told you they kicked?

"[KENT]: It was on the interrogation video.

"[PROSECUTOR]: Right. [¶] Mr. Strain reenacts the kicking, right?

"[KENT]: Yes.

"[PROSECUTOR]: And Mr. Holloran says something, 'I was kicking him, bang, bang, bang, and then I got hit by the car. Pow,' right?

"[KENT]: Yes."

On cross-examination by Holloran's counsel, Kent said he did not have an independent recollection of Holloran's words but heard them on the recording and believed the transcript matched what he heard on the recording.

Strain testified he was drunk that day. He punched Brown but did not kick or injure Dickerson or Dobbs and did not chase Williams. Holloran and Anderson got into an argument with Williams and Thompson. Thompson became aggressive, saying he would "fuck anybody up that wants it." Strain took the comment from Thompson (who was five feet two inches tall) as a threat, and he and Holloran walked toward Thompson and chased him when he ran. Strain testified he did not know why he ran after Thompson. Holloran fell behind and disappeared. Strain gave up the chase and walked toward the parking area. Anderson ran up to him and told him there was a big fight in the parking lot and someone was hurt. Strain then ran toward the parking lot and saw Dickerson on the ground. A truck brushed by Strain, causing him to stumble and fall over the bloodied Dickerson, but he testified he had no idea how he

9

got blood on his shoes.

Strain claimed he was being sarcastic during the conversation at the sheriff's station when he told his friends he had "put bodies" on his shoes.  He said he could not explain why he said "[w]e had it taken care of," although he was referring to the people with whom he had been.   As for the stomping reenactment, Strain claimed he was mimicking what Anderson had done, even though he never said anything about Anderson at the time he demonstrated the stomping movements.

Strain agreed that the male described by witnesses as mixed-race with hazel eyes was Nelson.

**Verdicts and Sentencing**

The jury found Strain guilty on counts two and three—aggravated mayhem and assault with force likely to produce GBI on Dickerson, but not guilty on the other counts or as to attempted voluntary manslaughter, a lesser included offense to attempted murder charged in count one.   The jury found true the allegations that Strain personally inflicted GBI and caused paralysis or coma due to brain injury.  The jury found the gang allegation on counts two and three not true.

The trial court sentenced Strain to an indeterminate term of seven years to life on count two and imposed but stayed pursuant to section 654 a determinate term of eight years for count three and its enhancement.

People v. Strain, et al., 2013 WL 32333242, **1-7 (Cal. App. 3 Dist. June 26, 2013), also at Lod. Doc. #5.[1]  The facts as set forth by the state court of appeal are presumed correct absent proof of error by clear and convincing evidence.  28 U.S.C. §2254(e)(1).

II.  Procedural History

Petitioner and codefendants Holloran and Nelson appealed the judgment to the Court of Appeal for the Third Appellate District in consolidated appeals.  People v. Strain, 2013 WL 32333242, *1.  In its June 26, 2013 decision, the court of appeals remanded for a restitution hearing related to one of the victims, and made various other orders related to victim restitution.  Id.  It otherwise affirmed the judgments against defendants.  Id.

Petitioner commenced the instant federal habeas action on April 18, 2014.  (Ptn.)

////

////

_____

[1] See ECF No. 21.

<u>ANALYSIS</u>

I. <u>AEDPA</u>

The statutory limitations of federal courts' power to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'"  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011).  Rather, "when a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  <u>Id.</u> at 784-785, citing <u>Harris v. Reed</u>, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis).  "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."  <u>Id.</u> at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable application of federal law is different from an incorrect application of federal law.'"  <u>Harrington</u>, <u>supra</u>, 131 S. Ct. at 785, citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  <u>Id.</u> at 786, citing

11

1    Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

2    determine what arguments or theories supported or . . . could have supported[] the state court's

3    decision; and then it must ask whether it is possible fairminded jurists could disagree that those

4    arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

5    "Evaluating whether a rule application was unreasonable requires considering the rule's

6    specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

7    case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

8    short of imposing a complete bar of federal court relitigation of claims already rejected in state

9    court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

10   mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade,

11   538 U.S. 63, 75 (2003).

12       The undersigned also finds that the same deference is paid to the factual determinations of

13   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

14   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

15   decision that was based on an unreasonable determination of the facts in light of the evidence

16   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

17   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

18   factual error must be so apparent that "fairminded jurists" examining the same record could not

19   abide by the state court factual determination.  A petitioner must show clearly and convincingly

20   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

21       The habeas corpus petitioner bears the burden of demonstrating the objectively

22   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

23   Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

24   court's ruling on the claim being presented in federal court was so lacking in justification that

25   there was an error well understood and comprehended in existing law beyond any possibility for

26   fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is

27   law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

28   Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not

1   qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established

2   law not permitting state sponsored practices to inject bias into a criminal proceeding by

3   compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards

4   does not qualify as clearly established law when spectators' conduct is the alleged cause of bias

5   injection).  The established Supreme Court authority reviewed must be a pronouncement on

6   constitutional principles, or other controlling federal law, as opposed to a pronouncement of

7   statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

8          The state courts need not have cited to federal authority, or even have indicated awareness

9   of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8.  Where the state

10  courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

11  court will independently review the record in adjudication of that issue.  "Independent review of

12  the record is not de novo review of the constitutional issue, but rather, the only method by which

13  we can determine whether a silent state court decision is objectively unreasonable."  Himes v.

14  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

15         "When a state court rejects a federal claim without expressly addressing that claim, a

16  federal habeas court must presume that the federal claim was adjudicated on the merits – but that

17  presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

18  1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

19  was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

20  the claim.  Id. at 1097.

21  II.  Petitioner's Claims

22  A.  Sufficiency of the Evidence

23         Petitioner reasserts his argument on appeal that his aggravated mayhem conviction should

24  be reduced to simple mayhem.  (Ptn. at 5; see Lod. Doc. 1 at 20-25.)  He argues that "[t]here was

25  insufficient evidence that the assaultive conduct directed at Dickerson involved a specific intent

26  to cause a maiming injury"; rather, the evidence showed only "an indiscriminate frenzy of

27  ////

28  ////

violence." (Lod. Doc. 1 at 20.)  Under California law, simple mayhem is a general intent crime[2],

while aggravated mayhem requires specific intent to cause a maiming injury.[3]

On appeal, petitioner argued:

> [T]he evidence showed that the perpetrators of the attack on Dickerson acted in an alcohol-fueled frenzy of violence or for the purpose of trying to rescue Kent when he called for help in his confrontation with Dickerson, Dobbs, and Tweaker.  (See 3 RT 679-680.)  In either event, there was no 'controlled or directed' attack toward a specific goal of permanently disabling or disfiguring Dickerson, as would be required to sustain a conviction for aggravated mayhem.  [Citation omitted.]  Instead, what was presented here was the type of 'indiscriminate' attack or 'explosion of violence' upon the victim which is insufficient to sustain a finding of aggravated mayhem in violation of section 205.  [Citations omitted.]

(Lod. Doc. 1 at 25.)

In its analysis of this claim, the state court of appeal reasoned:

> Holloran and Strain contend there is insufficient evidence to support their conviction of aggravated mayhem (§ 205), [footnote omitted] because there was insufficient evidence of intent to maim.  They contend that, at most, the evidence supports only a conviction for simple mayhem.  (§ 203.)  [Footnote omitted.]  We disagree.
>
> "In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence — evidence that is reasonable, credible and of solid value — such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citations.]  The same standard applies when the conviction rests primarily on circumstantial evidence.

[2] Cal. Penal Code § 203: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless, or cuts or disables the tongue, or puts out an eye, or slits the nose, ear, or lip, is guilty of mayhem."  See also Cal. Penal Code § 204 (simple mayhem punishable by prison term of up to eight years).

[3] Cal. Penal Code § 205: "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body. For purposes of this section, it is not necessary to prove an intent to kill. Aggravated mayhem is a felony punishable by imprisonment in the state prison for life with the possibility of parole."

14

[Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] "'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (People v. Kraft (2000) 23 Cal.4th 978, 1053–1054 (Kraft).)

Aggravated mayhem under section 205 is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury—permanent disability or disfigurement. (People v. Quintero (2006) 135 Cal.App.4th 1152, 1162 (Quintero).) Specific intent to maim may not be inferred solely from evidence that the resulting injury disables or disfigures the victim. (People v. Ferrell (1990) 218 Cal.App.3d 828, 835.) However, "'specific intent may be inferred from the circumstances attending an act, the manner in which it is done, and the means used, among other factors.'" (Quintero, supra, 135 Cal.App.4th at p. 1162.) "[E]vidence of a 'controlled and directed' attack or an attack of 'focused or limited scope' may provide substantial evidence of such specific intent." (Ibid.; see id. at p. 1163 [evidence that defendant slashed victim's face many times with a knife supported aggravated mayhem conviction]; People v. Park (2003) 112 Cal.App.4th 61; People v. Lee (1990) 220 Cal.App.3d 320, 326.) If the evidence instead shows only an indiscriminate or random attack in an explosion of violence upon the victim, it is insufficient for a finding of aggravated mayhem. (Lee, supra, 220 Cal.App.3d at p. 326 [insufficient evidence of aggravated mayhem where defendant hit victim three times in the face with his fist and kicked him at least twice somewhere on his body].)

Strain argues the evidence here shows only an alcohol-induced frenzy of violence. Holloran says the evidence shows defendants either coming to the aid of a beleaguered friend (Kent) or exploding in violence.

The evidence showed a focused attack. Dickerson's coma and paralysis were caused by the stomping and kicking to his head. Although some witnesses described blows to Dickerson's head and "body," the medical evidence showed that all of the injuries were to Dickerson's head, except for a laceration to the wrist, which was consistent with a defensive wound incurred as the victim tried to fend off the blows to his head. Among the injuries to Dickerson's head were multiple facial fractures. Ravareau testified that Dickerson's face was so bloody that she could not see it.

The finding of specific intent here was bolstered by Kent's testimony that, as defendants went to leave the park, Nelson went back to Dickerson, who was already unconscious, and kicked him one last time. (See Quintero, supra, 135 Cal.App.4th at p. 1159 [after slashing victim's face with a knife, defendant said, " 'Fuck you, fool,' " and asked, " 'How do you like this?'"].)

1

2

3

4

5

> That defendants had been drinking does not reduce their culpability from aggravated mayhem to mayhem. Voluntary intoxication may be a defense to a specific intent crime but only if the intoxication prevented the defendant from forming the specific intent. (§ 22; People v. Saille (1991) 54 Cal.3d 1103, 1119.) Although there was evidence that defendants were drinking alcohol, defendants cite no evidence that alcohol consumption prevented any of them from forming the specific intent to maim.
>
> . . .

6

7

> We conclude substantial evidence supports Strain's and Holloran's convictions for aggravated mayhem.

8

People v. Strain, 2013 WL 3233242, **18-20.

9    The Due Process Clause of the Fourteenth Amendment "protects the accused against

10   conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

11   crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient

12   evidence to support a conviction if, "after viewing the evidence in the light most favorable to the

13   prosecution, any rational trier of fact could have found the essential elements of the crime beyond

14   a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "A petitioner for a federal

15   writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used

16   to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262,

17   1274 (9th Cir. 2005). In order to grant the writ, the federal habeas court must find that the

18   decision of the state court reflected an objectively unreasonable application of Jackson and

19   Winship to the facts of the case. Id. at 1275 & n. 13.

20   On federal habeas review, the court applies the Jackson standard "with explicit reference

21   to the substantive elements of the criminal offense as defined by state law." Davis v. Woodford,

22   384 F.3d 628, 639 (9th Cir. 2004), citing Jackson, supra, at 324 n. 16. Here, the state court set

23   forth the substantive elements of aggravated mayhem under California law, including a

24   requirement of "specific intent" to cause permanent disability or disfigurement.

25   Viewing the facts in the light most favorable to the prosecution, a trier of fact could have

26   found beyond a reasonable doubt that petitioner had the requisite intent for aggravated mayhem

27   under California law. Both witness testimony and medical evidence indicated that Dickerson's

28   attackers targeted his head, resulting in multiple facial fractures, a coma, paralysis, and traumatic

16

1   brain injury.  See 10 RT 2766 (prosecutor argues in closing that, in directing kicks and blows to

2   victim's head, "you're going after the nerve center  . . . the most vulnerable part of someone's

3   body . . . the most fragile part," evidencing intent to disable or disfigure).  As the state court's

4   analysis was not an objectively unreasonable application of Jackson or Winship, petitioner is not

5   entitled to habeas relief on this claim.

6   B.  Jury Instruction – Aiding and Abetting

7          Petitioner next claims that the trial court erroneously instructed the jury so as to allow it to

8   find petitioner guilty of aggravated mayhem, even if the "natural and probable consequence" of

9   the offense amounted to no more than simple mayhem.  (Ptn. at 7; Lod. Doc. 1 at 26-39.)

10         Specifically, petitioner challenges the use of CALCRIM Nos. 400 and 402.  As given to

11  the jury, CALCRIM No. 400 stated in part:

> A person may be guilty of a crime in two ways.  One, he may have directly committed the crime.  I will call that person the perpetrator.  Two, he may have aided and abetted a perpetrator, who directly committed the crime.  A person is equally guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it.

16  (8 CT 2203; emphasis added.)

17         CALCRIM No. 402 instructed the jury on the natural and probable causes doctrine, stating

18  in part:

> The defendants are charged in Count Three with assault by means of force likely to produce great bodily injury and in Counts One and Two with attempted murder and aggravated mayhem.

> Under the natural and probable consequences theory, you must first decide whether the defendant is guilty of assault by force likely to produce great bodily injury.  If you find the defendant guilty of this crime, you must then decide whether he is guilty of attempted murder or aggravated mayhem.

> Under certain circumstances, a person who is guilty of one crime may also be guilty of other crimes that were committed at the same time.

> To prove that the defendant is guilty of attempted murder or aggravated mayhem under the natural and probable consequences theory, the People must prove that:

> 1.  The defendant is guilty of assault by means of force likely to

17

1    produce great bodily injury;

2    2.  During the commission of assault by means of force likely to
     produce great bodily injury a coparticipant in that assault . . .
3    committed the crime of attempted murder or <u>aggravated mayhem</u>;

4    AND

5    3.   Under all of the circumstances, a reasonable person in the
     defendant's position would have known that the commission of
6    attempted murder or <u>aggravated mayhem</u> was a natural and
     probable consequence of the commission of the assault by means of
7    force likely to produce great bodily injury.

8    . . .

9    A natural and probable consequence is one that a reasonable person
     would know is likely to happen if nothing unusual intervenes.  In
10   deciding whether a consequence is natural and probable, consider
     all of the circumstances established by the evidence . . .

11
     To decide whether the crime of attempted murder or <u>aggravated</u>
12   <u>mayhem</u> was committed, please refer to the separate instructions
     that I have given you on that crime.

13

14   (8 CT 2206-2207; emphasis added.)

15        Petitioner argues that these instructions "permitted the jury to convict [him] of aggravated

16   mayhem because that was equal to the crime committed by the perpetrator . . . per CALCRIM No.

17   400, notwithstanding that 'a reasonable person in the defendant's position' would have foreseen

18   no greater crime than a simple mayhem arising from aiding and abetting the intended target crime

19   of aggravated assault."  (Lod. Doc. 1 at 29.)  Petitioner identifies "the perpetrator" in this scenario

20   as "perhaps Nelson or Kent."  (<u>Id.</u> at 34.)  On this theory, "the perpetrator" intended to

21   permanently disfigure or disable Dickerson, while petitioner was found guilty of aggravated

22   mayhem as an aider and abettor under the "natural and probable consequences" doctrine.  (<u>Id.</u>)

23        In its analysis of this claim, the state court of appeal reasoned:

24        Strain contends that the jury instructions stating an aider and abettor
          is "equally guilty" with the perpetrator misled the jury by
25        effectively directing that aiders and abettors who are liable under
          the natural and probable consequences doctrine must necessarily be
26        convicted of aggravated mayhem, the same offense as the
          perpetrators, rather than a lesser offense of simple mayhem. Strain
27        also complains the instruction on natural and probable
          consequences was misleading because it did not include simple
28        mayhem as a nontarget offense alternative to aggravated mayhem.

                                          18

FN27

FN27. Strain does not assert error related to the "equally guilty" language in CALCRIM former No. 400 as applied to a person who directly aids and abets the intended act as explained in CALCRIM former No. 401. Thus, we do not address it here.

. . .

Because CALCRIM former No. 400 was generally accurate, we conclude defendants forfeited their claims concerning the "equally guilty" language by failing to request that the trial court modify the instruction. (People v. Loza (2012) 207 Cal.App.4th 332, 349–350 (Loza); People v. Lopez (2011) 198 Cal.App.4th 1106, 1118–1119; People v. Canizalez (2011) 197 Cal.App.4th 832, 849 (Canizalez); People v. Samaniego (2009) 172 Cal.App.4th 1148, 1163 (Samaniego).) Further, the failure to state that defendants could also be guilty of the nontarget offense of simple mayhem based on the natural and probable consequences instruction given here "made the instruction, at most, incomplete in the context of this case, not incorrect." (Canizalez, supra, 197 Cal.App.4th at p. 849.) Therefore, defendants were required to request modification of the instruction to add simple mayhem as a natural and probable consequence of the target offense. (Ibid.)

In light of Kent's ineffective assistance of counsel claim and to forestall any such future claim by Strain, we address the merits of defendants' contentions on appeal. Strain's assertions are erroneously premised on a connection between the "equally guilty" language in the general aiding and abetting instruction, CALCRIM former No. 400, and the modified version of CALCRIM No. 402, which described natural and probable consequences liability. While lawyers and judges understand the natural and probable consequences doctrine to be a form of aiding and abetting liability, the natural and probable consequences instruction did not call that doctrine a form of aiding and abetting and the instruction was not expressly tied to "equally guilty" language in the general aiding and abetting instruction in CALCRIM former No. 400. Indeed, the natural and probable consequences instruction treated that doctrine as a separate theory of liability.

The trial court instructed the jury with CALCRIM former No. 400[.][4]

. . .

The court then instructed the jury on direct aiding and abetting (CALCRIM former No. 401) FN29 and on the natural and probable consequences doctrine, using an apparently modified version of CALCRIM No. 402.

---

[4] See text of CALCRIM No. 400, above.

FN29. CALCRIM former No. 401 read in pertinent part: "To prove that the defendants are guilty of a crime *based on aiding and abetting that crime*, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendants knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendants intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendants' words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose and he specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. [¶] If all of these requirements are proved, the defendants do not need to actually have been present when the crime was committed to be guilty as an aider and abettor. [¶] If you conclude that defendants were present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether the defendants were aiders and abettors. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not by itself, make him an aider and abettor...." (Italics added; original italics omitted.)

In instructing on the natural and probable consequences doctrine, the trial court told the jury: [. . .][5]

We employ an independent standard of review to questions of whether jury instructions correctly state the law and whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration. (People v. Posey (2004) 32 Cal.4th 193, 218.)

Our high court in People v. McCoy (2001) 25 Cal.4th 1111, 1114, held an aider and abettor in a case of direct aiding and abetting could be found guilty of a greater offense than the direct perpetrator. The reasoning in that case led the court in Samaniego to conclude an aider and abettor's guilt may be less than the perpetrator's, if the aider and abettor has a less culpable mental state. (Samaniego, supra, 172 Cal.App.4th at pp. 1164–1165.) The court in Samaniego said the "equally guilty" language in CALCRIM former No. 400 was "generally correct in all but the most exceptional circumstances" but should have been modified. (Samaniego, supra, at p. 1165.)

Strain relies on this court's decisions in People v. Woods (1992) 8 Cal.App.4th 1570 (Woods) and People v. Hart (2009) 176 Cal.App.4th 662 (Hart), disapproved on other grounds in People v. Favor (2012) 54 Cal.4th 868, 879, fn. 3 (Favor), asserting that both cases "make clear, it is incorrect to inform the jurors that an aider and abettor 'is equally guilty' with respect to the perpetrator" in a prosecution grounded on the natural and probable consequences doctrine. While the court discussed the natural and probable consequences doctrine in both Woods and Hart, neither case discussed the "equally guilty" language in CALCRIM former No.

---

[5] See text of CALCRIM No. 402, above.

400 as that language was not implicated in the issues presented in those cases. Thus, <u>Woods</u> and <u>Hart</u> do not support Strain's argument.

With the exception of <u>Canizalez</u>, FN30 the cases in which courts have held the "equally guilty" language to be potentially erroneous have all involved prosecutions grounded on direct aiding and abetting, not cases involving the natural and probable consequences doctrine. [Citations.]  In each case, the jury was instructed with the aiding and abetting general instruction, CALCRIM former No. 400 or former CALJIC No. 3.00, which once contained the "equally guilty" language, and CALCRIM former No. 401 or former CALJIC No. 3.01, the instructions defining direct aiding and abetting. CALCRIM former No. 400 began, "A person may be guilty of a crime in two ways." (Italics added.) That instruction then went on to identify the two ways—by personally committing the crime as a "perpetrator" and by aiding and abetting, and then indicated that both are "equally guilty." CALCRIM former No. 401 began, "To prove that the defendant is guilty of a crime *based on aiding and abetting* that crime...." (Italics added.) Thus, the definition of aiding and abetting in that instruction is directly linked to the statement in CALCRIM former No. 400, "A person is *equally guilty* of the crime whether he committed it personally *or aided and abetted* the perpetrator who committed it." (Italics added.)

FN30. The court in <u>Canizalez</u> held that the "equally guilty" language in CALCRIM former No. 400 is actually legally correct in the context of defendants culpable under the natural and probable consequences doctrine. . . .

The natural and probable consequences instruction given, on the other hand, does not say that a person who may be culpable for the nontarget offense is an aider and abettor to that offense. Instead, the version of CALCRIM No. 402 used here identifies the natural and probable consequences doctrine as a third theory, separate from direct perpetration and aiding and abetting. As can be seen in the italicized language, ante, the first sentence in the second paragraph begins, "Under the natural and probable consequences theory...." The first sentence in the fourth paragraph begins, "To prove that the defendant is guilty of attempted murder or aggravated mayhem under the natural and probable consequences theory...." Notwithstanding its legal status as a form of aiding and abetting, the natural and probable consequences doctrine was explained to the jurors as a separate theory of legal liability. Consequently, we conclude that it was unlikely the jury read the "equally guilty" language in CALCRIM former No. 400 to apply to the natural and probable consequences instruction.

Moreover, in his closing arguments, the prosecutor did not link the natural and probable consequences theory to aiding and abetting or the "equally guilty" language. Consistent with the instructions, the prosecutor argued natural and probable consequences as an entirely separate theory. He described "three different ways to get" to a guilty verdict. He discussed being an actual perpetrator, aiding and

abetting, and natural and probable consequences. As for aiding and abetting, the prosecutor initially explained, "[defendant] has to know of the unlawful purpose of the perpetrator. He has to intend to aid, encourage or facilitate the crime. He has to by act or advice, actually aid, encourage or instigate the crime. Okay. So that's aider and abettor. [¶] Then there's natural and probable consequences. I'm not going to say anything about that right now because that is significantly more complex than either being a perpetrator or an aider and abettor. I'll get to that in just a second." Later, when the prosecutor discussed the natural and probable consequences theory, he argued that the jury should look at that theory if it determined a defendant "had no idea" the perpetrator intended to commit the target offense. In rebuttal, regarding Kent, the prosecutor told the jury, "But if you find that all he did was an assault, and somebody else intended to kill or intended to disable or disfigure, and he had no idea that Mr. Strain or Mr. Nelson or Mr. Holloran had that intent, he is still guilty *if* you find that an attempted murder or an intent [sic] or an aggravated mayhem is a natural and probable consequence." (Italics added.) Thus, the prosecutor in effect argued equal guilt with those who are guilty of the nontarget crime only *if* the nontarget crime is a natural and probable consequence of the target crime.

As for inclusion of simple mayhem in the natural and probable consequences instruction, Strain does not expressly assert that the trial court had a sua sponte duty to include it in the list of nontarget offenses, but his argument that failure to do so misled the jury sounds like a close cousin, especially given his reliance on Woods and Hart.  In Woods, this court said, "in determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence. Otherwise, ... the jury would be given an unwarranted, all-or-nothing choice for aider and abettor liability. [Citation.]" (Woods, supra, 8 Cal.App.4th at p. 1588.) The court concluded the evidence did not warrant sua sponte instruction in that case, but said, "If the evidence raises a question whether the offense charged against the aider and abettor is a reasonably foreseeable consequence of the criminal act originally aided and abetted but would support a finding that a necessarily included offense committed by the perpetrator was such a consequence, the trial court has a duty to instruct sua sponte on the necessarily included offense as part of the jury instructions on aider and abettor liability." (Id. at p. 1593.) In Hart, this court applied Woods to reverse an aider and abettor's conviction for attempted deliberate and premeditated murder as a natural and probable consequence of an attempted robbery. This court held that it was "necessary to instruct the jury that it may find less culpability in the aider and abettor under the natural and probable consequences doctrine." (Hart, supra, 176 Cal.App.4th at p. 673.) FN31

FN31. Under the facts in Hart, this court held it was theoretically possible for the jury to conclude that the perpetrator premeditated

the attempted murder but that such premeditation was not a natural and probable consequence of the attempted robbery. (Hart, supra, 176 Cal.App.4th at p. 672.)  In Favor, our high court disapproved Hart's analysis to the extent it viewed attempted unpremeditated murder as a lesser offense of attempted premeditated murder. (Favor, supra, 54 Cal.4th at p. 879 & fn. 3.) We do not read Favor as abrogating Woods or Hart insofar as they hold the trial court has a sua sponte duty to instruct on the lesser included nontarget offenses.

Here, even though the trial court should have added simple mayhem as a nontarget offense in the jury instructions on the natural and probable consequence theory, the error was harmless.

Error regarding the "equally guilty" language is measured by the harmless-beyond-a-reasonable-doubt standard of Chapman. (Nero, supra, 181 Cal.App.4th at pp. 518–519; Samaniego, supra, 172 Cal.App.4th at p. 1165.) As to the omission of simple mayhem from the natural and probable consequence instruction, this court has observed, "Error in instructing the jury concerning lesser forms of culpability is reversible unless it can be shown that the jury properly resolved the question under the instructions, as given. [Citation.]" (Hart, supra, 176 Cal.App.4th at p. 673.)

The error here was harmless. First, there was ample evidence – including eyewitness testimony and Strain's video recorded stomping demonstration—that established his guilt as a direct perpetrator of aggravated mayhem. . . . Second, as we have already observed, we know for sure that the instructions did not mislead the jury. The jurors clearly understood they could find defendants guilty of a lesser offense, because they did so. They found Kent not guilty of aggravated mayhem but guilty of simple mayhem, while finding Holloran and Strain guilty of aggravated mayhem. We thus know the Strain/Holloran/Kent jury was not misled by the instructions.

. . .

We reject defense arguments that prejudice is shown by the length of deliberations (eight days) and the jurors' requests for a rereading of testimony, a legal definition of intent, etc. Those circumstances establish nothing. We reject Strain's argument that prejudice is shown by the prosecutor's closing argument to the jury, which Strain perceives as exploiting instructional error. As we have noted, it does not.

We conclude that the instructions were not misleading, the totality of the instructions properly supplied the jury with the applicable law, and any error related to the omission of simple mayhem as a non-target offense in the natural and probable consequences instruction was harmless.

People v. Strain, 2013 WL 3233242, **22-27.

////

1    Respondent argues that this claim is procedurally defaulted, as the state court of appeal

2    concluded that defendants forfeited their challenges to CALCRIM Nos. 400 and 402 by failing to

3    request modifications to these instructions at trial.  In <u>Rich v. Calderon</u>, 187 F.3d 1064, 1066 (9th

4    Cir. 1999) and <u>Vansickel v. White</u>, 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that

5    California's contemporaneous objection rule is an adequate and independent state procedural rule

6    when properly invoked by the state courts.  The Ninth Circuit has also concluded that the

7    contemporaneous objection rule has been consistently applied by the California courts.  <u>See</u>

8    <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir. 2002).  Here, petitioner has not shown cause[6],

9    nor has he demonstrated that failure to consider this claim will result in a fundamental

10   miscarriage of justice.  Thus this claim is procedurally barred.

11   In the alternative, the undersigned finds that petitioner's claim lacks merit.  In general, a

12   challenge to jury instructions does not state a federal constitutional claim.  <u>Engle v. Isaac</u>, 456

13   U.S. 107, 119  (1982); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  To warrant

14   federal habeas relief, a challenge instruction cannot be "merely . . . undesirable, erroneous, or

15   even 'universally condemned,'" but must violate some due process right guaranteed by the

16   fourteenth amendment.  <u>Cupp v. Naughten</u>, 414 U.S. 141, 146 (1973).

17   It is well established that the instruction "may not be judged in artificial isolation," but

18   must be considered in the context of the instructions as a whole and the trial record.  <u>Cupp</u>, 414

19   U.S. at 147.  Even if there is an instructional error, a habeas petitioner is not entitled to relief

20   unless the error "had substantial and injurious effect or influence in determining the jury's

21   verdict."  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993).

22   Here, the state court properly considered the challenged instructions in the context of the

23   accompanying instructions and the trial record.  While petitioner's argument conflates the "aiding

24   and abetting" and "natural and probable consequences" standards, the state court found that they

---

25   [6] The cause standard requires the petitioner to show that "some objective factor external to the
26   defense impeded counsel's efforts to construct or raise the claim."  <u>McCleskey v. Zant</u>, 499 U.S.
     467, 493 (1991) (internal quotations omitted).   A petitioner may show cause by establishing
27   constitutionally ineffective assistance of counsel, but attorney error short of constitutionally
     ineffective assistance of counsel does not constitute cause and will not excuse a procedural
28   default.  <u>Id.</u> at 494.

1    were "entirely separate" theories of culpability, never linked by the prosecutor in closing

2    argument.  The state court further determined that, while "the trial court should have added

3    simple mayhem as a nontarget offense in the jury instructions on the natural and probable

4    consequences theory," the error was harmless, as there was "ample evidence" that petitioner was

5    guilty as a direct perpetrator of aggravated mayhem.  This conclusion is supported by the record.

6    Moreover, the jury "clearly understood they could find defendants guilty of a lesser offense,"

7    because they found Kent guilty of simple mayhem but not aggravated mayhem, unlike petitioner.

8         Because the state court's conclusion does not offend clearly established Supreme Court

9    precedent or amount to an objectively unreasonable determination of the facts, petitioner is not

10   entitled to federal habeas relief on this claim.

11   C.  Jury Instruction – Consciousness of Guilt

12        Petitioner next claims that the jury instructions regarding consciousness-of-guilt evidence

13   violated his rights to due process and a fair trial, as they created an inference that he was "aware

14   of his guilt" – i.e., guilty.  Petitioner argues that the instructions "invaded the jury's province and

15   lowered the prosecution's burden of proof[.]"  (Ptn. at 8; Lod. Doc. 1 at 40-56.)

16        In its analysis of this claim, the state court of appeal considered the challenged

17   instructions, CALCRIM Nos. 362, 371, and 372:

18
19   > Strain complains the three "consciousness of guilt" instructions,
     > which said certain conduct may show defendant was "aware of his
     > guilt," invaded the jury's province and lowered the prosecutor's
20   > burden of proof, because one cannot be "aware of his guilt" unless
     > he is in fact guilty.  Assuming the issue is preserved for appeal, we
21   > reject the contention.

22   > "On review, we examine the instructions as a whole, in light of the
     > trial record, to determine whether it is reasonably likely the jury
23   > understood the challenged instruction[s] in a way that undermined
     > the presumption of innocence or tended to relieve the prosecution
     > of the burden to prove defendant's guilt beyond a reasonable
24   > doubt." (People v. Paysinger (2009) 174 Cal.App.4th 26, 30
     > (Paysinger).)
25
     > The jury received the following standard instructions:
26
27   > CALCRIM No. 362: "If a defendant made a false or misleading
     > statement relating to the charged crime, knowing the statement was
     > false or intending to mislead, that conduct may show he was aware
28   > of his guilt of the crime and you may consider it in determining his

guilt. You may not consider the statement in deciding any other defendant's guilt. [¶] If you conclude that the defendant made the statement, it is up to you to decide its meaning and importance. However, evidence that the defendant made such a statement cannot prove guilt by itself."

CALCRIM No. 371: "If a defendant tried to hide evidence, that conduct may show that he was aware of his guilt. If you conclude that a defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself. [¶] [Same language for creating false evidence and admonition to consider the evidence only against the defendant who engaged in the conduct.]"

CALCRIM No. 372: "If a defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that a defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that a defendant fled cannot prove guilt by itself."

The prosecutor argued consciousness of guilt to the jury in the following evidence: Defendants fled after dropping off Holloran at home; Kent yelled at Anderson to "stop snitching"; Holloran lied to the police in the hospital; and during the surreptitiously recorded conversation they talked about jumping bail, Holloran told Strain to say the blood on his pants came from Holloran, and Strain said nothing about falling on Dickerson.

Strain concedes case law defeats his argument that the current instructions' language—"aware of his guilt"—is more onerous for defendants than the previous language—"consciousness of guilt." (People v. Hernandez Rios (2007) 151 Cal.App.4th 1154, 1158–1159 [etymological analysis by Fifth District concluded consciousness and awareness were synonymous].) Strain suggests that Hernandez–Rios was wrongly decided. He argues that in the context of a criminal prosecution, a person could have a vague generalized consciousness of guilt, akin to a guilty conscience, without having a specific awareness of guilt, whereas the latter term leaves no room for a "not guilty" verdict. We disagree.

This court rejected challenges to these instructions in People v. McGowan (2008) 160 Cal.App.4th 1099 (McGowan), and Paysinger, supra, 174 Cal.App.4th 26, though not on the specific ground presented here. . . .

We also reject Strain's contention that the instructions "amounted to mandatory presumptions or burden-shifting presumptions that [he] was guilty if his behavior was substantially consistent with what was described in those instructions." The instructions simply state that the identified behavior "may show" a defendant is aware of his guilt, but at the same time explain that it is up to the jury to decide the meaning and importance of such behavior. Thus, just like the CALJIC predecessors, the instructions "ma[k]e clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also

clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior." (<u>People v. Jackson</u> (1996) 13 Cal.4th 1164, 1224 (<u>Jackson</u>).) The instructions do not lessen the prosecution's burden of proof. (<u>People v. Benavides</u> (2005) 35 Cal.4th 69, 99–100.)

Indeed, the instructions favor defendant Strain by providing balance. "The cautionary nature of the instructions benefits the defense, admonishing the jury to circumspection regarding evidence that might otherwise be considered decisively inculpatory. [Citation.]"    (<u>Jackson</u>, <u>supra</u>, 13 Cal.4th at p. 1224.)    Each instruction tells the jury it may consider the evidence but the evidence "'cannot prove guilt by itself.' " (<u>McGowan</u>, <u>supra</u>, 160 Cal.App.4th at p. 1104, citing <u>People v. Kelly</u> (1992) 1 Cal.4th 495, 531–532 [noting the CALJIC predecessor language, " 'but it is not sufficient by itself to prove guilt '"].)

We conclude there was no instructional error.

<u>People v. Strain</u>, 2013 WL 3233242, **27-29.

Here, the state court determined that the challenged instructions accorded with California law and did not prejudice petitioner.  In reaching this conclusion, the state court considered the instructions in the context of the trial record.  Petitioner has not shown that the state court's conclusion was objectively unreasonable under clearly established Supreme Court precedent, nor that it reflected an objectively unreasonable determination of the facts at trial.  Thus he is not entitled to federal habeas relief on this claim.

D.  <u>Prosecutorial Misconduct</u>

Petitioner next claims that the prosecutor committed misconduct by distorting the definition of reasonable doubt in his closing argument to the jury, violating petitioner's rights to due process and a fair trial.  Specifically, petitioner argues that that the prosecutor improperly (1) told the jury they should define for themselves the meaning of "abiding conviction"; (2) compared deliberating about defendants' guilt to putting together a puzzle, where it was possible to see the "big picture" with a few pieces missing; and (3) told the jury that "reasonable doubt" required more than a "gut feeling" that could not be articulated.[7]

_____

[7] In its discussion of this claim on appeal, the state court excerpted the challenged portions of the prosecutor's closing argument.  These are consistent with the undersigned's review of the trial record.  (<u>See</u> 10 RT 2738-2739.)

Petitioner also asserts that his trial counsel was ineffective for failing to object to the prosecutor's alleged misconduct, violating petitioner's Sixth Amendment right to counsel. (Ptn. at 10; Lod. Doc. 1 at 57-62.)  Moreover, such ineffectiveness would constitute cause in the "cause and prejudice" analysis of whether petitioner's due process claim is procedurally defaulted.[8]   See n.6, supra.

In analyzing petitioner's claim, the state court of appeal reasoned:

> I. Prosecutor's Closing Argument

> Holloran, joined by Kent and Strain, argues the prosecutor misled the jury on reasonable doubt three times in his closing argument. Strain, joined by Kent, also argues trial counsel rendered ineffective assistance of counsel by failing to object in the trial court. We disagree.

> All defendants forfeited these contentions. Not one of the defense attorneys objected to any of the prosecutor's comments. Had an admonition been necessary, it would have cured any harm.  (Hill, supra, 17 Cal.4th at p. 820.)

> Nevertheless, we will assume for the sake of argument that the contentions are preserved for appeal, and we therefore need not address ineffective assistance of counsel.  We see no prosecutorial misconduct.

> A prosecutor commits misconduct when he misrepresents the standard of proof or trivializes the quantum of evidence required to meet the standard of proof.  (Hill, supra, 17 Cal.4th at pp. 831–832.) When a claim of prosecutorial misconduct focuses on the prosecutor's comments in closing argument to the jury, the question of prejudicial impact is whether there is a reasonable likelihood the jury construed or applied the remarks in an objectionable fashion. (People v. Pierce (2009) 172 Cal.App.4th 567, 572 (Pierce).)

> 1. Abiding Conviction

> The first contention is that the prosecutor encouraged the jurors to come up with their own definition of "abiding conviction," which could make defendant guilty if the jurors thought he was probably guilty.

> The prosecutor told the jury:

> "[T]he law defines reasonable doubt as proof that leaves you with an abiding conviction that the charge is true. Nobody is going to

---

[8] The state court of appeal did not address petitioner's ineffective assistance argument as a stand-alone claim, but as an argument against procedural default.

define abiding conviction for you any further than that. It's one of those lawyer phrases. You decide what it means. *What it really mean [s] is*, when you vote, when you come in here and the verdicts are read, are you convinced that they're right? Are you satisfied that I've done my job and proved to you that each of these defendants is guilty? And when you go to your 4th of July picnic in a couple of weeks and you tell people finally about your jury duty and what it was about and what you heard, are you going to be satisfied with your verdict? Are you going to be convinced it's right?" (Italics added.)

Holloran says the prosecutor's comment was improper because "abiding conviction" has a meaning the jury is not entitled to ignore (Hopt v. Utah (1887) 120 U.S. 430, 439 [30 L. Ed. 708] (Hopt) ["settled and fixed"]; People v. Brigham (1979) 25 Cal.3d 283, 290 (Brigham) [lasting and permanent] ), and the jurors may have come up with their own definition that abiding conviction meant defendant was guilty if they thought it probable that he was guilty.

While the prosecutor said the term "abiding conviction" would not be defined and "[y]ou decide what it means," we read that statement in connection with the instruction that "[w]ords and phrases not specifically defined ... are to be applied using their ordinary, everyday meanings. (CALCRIM No. 200.)   And we observe that after stating, "[y]ou decide what it means," the prosecutor immediately went on to discuss what abiding conviction "really mean[s]" and used the example of still being convinced when thinking about the case in a couple of weeks at a Fourth of July picnic.

The descriptions of "abiding" in Hopt and Brigham "are self-evident and an unnecessary elaboration of a readily understood term." (Pierce, supra, 172 Cal.App.4th at p. 573; see id. at pp. 573–574 [no reasonable likelihood that jury was misled by prosecutor's remarks evoking permanence].)   The term has an ordinary, everyday meaning consistent with the prosecutor's comments, which evoked permanence. There was no prosecutorial misconduct regarding abiding conviction.

2. Puzzle Analogy

Holloran claims the prosecutor trivialized the quantum of proof by analogy to a puzzle. The prosecutor said:

"You impartially compare and consider all the evidence. Okay. It's a big-picture look at things because you can dissect anything and say, well, this little piece here isn't enough. This piece over here's not enough, but when you put it together and form the puzzle, you can tell what the big picture is.... [¶] ... [¶] ... Gary Larson of the Far Side has a cartoon that's applicable. A couple of helicopter pilots are flying over an island where a stranded guy has written, 'Health,' and the pilot says, 'Wait, wait. Cancel that. I guess it says, "Health." ' Okay. Ladies and gentlemen, if you get to, 'Health,' in this case, then the defendants are guilty. You don't have to get all the way to[ ] 'Help.' "

Holloran contends this court condemned an identical analogy in People v. Katzenberger (2009) 178 Cal.App.4th 1260. He is mistaken. In Katzenberger, this court found nonprejudicial misconduct in a prosecutor's use of an eight-piece puzzle of the Statue of Liberty to argue it was possible to identify the image beyond a reasonable doubt even with two pieces missing. (Id. at pp. 1264–1265, 1268–1269.) This court held the use of an easily recognizable iconic image, along with the suggestion of a quantitative measure of reasonable doubt, conveyed an impression of a lesser standard of proof. (Id. at p. 1268.) Here, in contrast, there was no visual aid, no iconic image, and no suggestion of a quantitative measure. Katzenberger does not help defendants.

3. Articulable Reasons to Doubt

Holloran complains that the prosecutor misled jurors to believe "reasonable doubt" requires an ability to articulate reasons for the doubt.

The prosecutor argued to the jury: "The terms reasonable doubt define themselves almost. It's a doubt that's based in reason. You should be back there using your head. Okay. You can't go with a gut feeling. You can't go on emotion. And so if you have what you think is a reasonable doubt and a juror says, 'Well, tell me about it. What is your doubt based on?' you should be able to explain it. You should be able to articulate it. You should be able to have a rational discussion about it. And if you can't do that, then all I'd ask you to do is stop and ask yourself, is it a reasonable doubt? If I can't explain it and I can't talk to my fellow jurors about it, is it reasonable, or is it something that's based on my gut?"

Holloran cites authority that it is not necessary for a juror, or a judge in a bench trial, to articulate reasons for reasonable doubt. Here, however, the prosecutor merely suggested that a juror unable to articulate reasons for doubt should reconsider whether the doubt was based on "gut" alone instead of reason. Thus, the cited cases are inapposite.

Holloran quotes from People v. Engelman (2002) 28 Cal.4th 436, in which our high court said, "It is not always easy for a juror to articulate the exact basis for disagreement after a complicated trial, nor is it necessary that a juror do so." (Id. at p. 446.) Engelman held that a former standard instruction given just prior to deliberations, which obligated jurors to report fellow jurors who refused to deliberate or follow the law, was inadvisable, because it created an unnecessary risk of inducing jurors to expose the content of deliberations. (Id. at pp. 439, 446.) In context, the language Holloran quotes is part of the Engelman court's observation that a juror does not necessarily commit misconduct in deliberations by disagreeing without articulating the basis for disagreement.

Holloran cites U.S. v. Chilingirian (6th Cir. 2002) 280 F.3d 704, 711, as stating that even a judge in a bench trial may have trouble articulating the basis for his doubt, yet find the defendant not guilty. However, that comment was made in the context of holding that

1

2

3

> inconsistent verdicts, whether by judge or jury, are not subject to reversal merely because of inconsistency. (Ibid.) Thus, the appellate court would not require a judge to make findings explaining the inconsistency for appellate review.

4

5

6

> Holloran notes a reasonable doubt may be based on a lack of evidence rather than a defect in the evidence (Johnson v. Louisiana (1972) 406 U.S. 356, 360 [32 L.Ed.2d 152] ), which would be difficult to articulate. Nevertheless, Holloran fails to cite any authority refuting the prosecutor's point that reasonable doubt should not be based on "gut" alone.

7

> There was no prosecutorial misconduct.

8

9

People v. Strain, 2013 WL 3233242, **31-34.

10

11

Respondent first argues that petitioner's due process claim is procedurally defaulted, as

12

the state court of appeal deemed it forfeited under the contemporaneous objection rule.  The

13

undersigned agrees, as petitioner has not shown "cause and prejudice" sufficient to overcome

14

procedural default of this claim.  As discussed below, his attorney was not constitutionally

ineffective in failing to object to the challenged portions of the prosecutor's closing argument.

15

Alternatively, the court finds that petitioner's due process claim fails on the merits.

16

"The prosecutor may argue reasonable inferences from the evidence presented[.]"  Menendez v.

17

Terhune, 422 F.3d 1012, 1037 (9th Cir. 2005), citing U.S. v. Young, 470 U.S. 1, 8 & n.5 (1985).

18

"In determining whether a due process violation has occurred as a result of comments made by

19

the prosecutor in argument, courts ask whether the prosecutors' comments 'so infected the trial

20

with unfairness as to make the resulting conviction a denial of due process.'"  Menendez v.

21

Terhune, 422 F.3d 1012, 1033-1034, quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986).

22

Here, the state court of appeal determined that the prosecutor's remarks were consistent

23

with California law and that no misconduct occurred.  The state courts' interpretation of state law,

24

including one announced on direct appeal of the challenged conviction, binds a federal habeas

25

court.  See Bradshaw v. Richey, 546 U.S. 74, 77 (2005); Hicks v. Feiock, 485 U.S. 624, 629

26

(1988).  Moreover, the state court's conclusion that petitioner's due process claim lacks merit is

27

not objectively unreasonable under clearly established Supreme Court precedent.

28

////

Finally, petitioner has not shown his counsel's failure to object to the prosecutor's closing statements fell below an objective standard of reasonableness, or that petitioner was prejudiced by his counsel's deficient performance.  Strickland v. Washington, 466 U.S. 668, 692, 694 (1984). Thus petitioner is not entitled to federal habeas relief on either due process or Sixth Amendment grounds.

E. Cumulative Error

Lastly, petitioner asserts that the cumulative effect of the errors committed at his trial requires the reversal of his convictions.  (Ptn. at 12; Lod. Doc. 1 at 63-65.)  The state court of appeal found this claim to be meritless.  People v. Strain, 2013 WL 3233242, *38.

As to petitioner's claims raised on federal habeas review, the state court identified only one error – the omission of "simple mayhem" in the jury instructions on the natural and probable consequence theory – which it reasonably deemed harmless in light of the full record.  See U.S. v. Rivera, 900 F.2d 1462, 1471 (9th Cir. 1990) ("[A] cumulative error analysis should evaluate only the effect of matters determined to be errors, not the cumulative effect of non-errors.").  As the state court's denial of petitioner's cumulative error claim was objectively reasonable under AEDPA, he is not entitled to federal habeas relief on this ground.

Accordingly, IT IS HEREBY ORDERED that:

1. The petition is denied;

2. The Clerk of Court shall close this case; and

3. The court declines to issue the certificate of appealability referenced in 28 U.S.C. §2253.

Dated:  July 24, 2015

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / stra1008.hc

32